535 So.2d 461 (1988)
SUCCESSION OF Elvira MACK.
No. 88-CA-0561.
Court of Appeal of Louisiana, Fourth Circuit.
November 10, 1988.
Rehearing Denied January 18, 1989.
Writ Denied March 10, 1989.
Laurie E. Rolling Harvey and Garland R. Rolling, Metairie, for appellee.
John C. Derenbecker, New Orleans, for appellant.
Before SCHOTT and LOBRANO, JJ., and PRESTON H. HUFFT, J. Pro Tem.
SCHOTT, Judge.
Elvira Mack died on September 4, 1986 at the age of 86. In February 1987 McKensy *462 Turner and Joseph M. Nielsen obtained probate of decedent's statutory will executed on November 14, 1983. In March, 1987 Audie Shields (hereinafter, opponent) filed an action to annul the will on the grounds that 1) decedent lacked testamentary capacity because of mental incompetence; 2) decedent was illiterate and the will was invalid because of its form; and 3) because McKensey Turner, universal legatee, was a religious minister who attended the decedent in her final illness, the will was invalid. The trial court found that decedent lacked testamentary capacity, annulled the will, and probated a 1985 will in which two of decedent's nephews, Jessie Scott and Audie Shields, opponent, were named as legatees. Turner has appealed. The principal issue is whether the evidence was sufficient to rebut the presumption that decedent was competent when she executed the will.
The evidence consisted of the testimony of numerous friends and relatives of decedent which conflicted as to decedent's ability to read and write and as to her mental state over several years before and after she executed the will until her death. Joseph Nielsen, an attorney and the notary who presided over the execution of the will and who was named as the executor also testified. Dr. Melville J. Sternberg, decedent's physician for many years prior and at the time of her death, was the key witness.
The trial judge provided extensive reasons for judgment in which she rejected the attack on the will based upon decedent's alleged illiteracy but found that the will's opponent has proved that decedent was mentally incompetent when she executed the will. The pertinent parts of the reasons for judgment are as follows:
This court was provided with both expert and lay testimony on the issue of mental capacity. Dr. Melville J. Sternberg, was Mrs. Mack's regular treating physician from 1973 until her death. The autopsy protocol substantiated Dr. Sternberg's earlier diagnosis of senile dementia. The autopsy showed evidence of marked cerebral atrophy, predominantly in the frontal and temporal lobes, which is compatible with Alzheimer's disease. According to Dr. Sternberg, the disease has a gradual onset and was manifested over a number of years. Dr. Sternberg testified by March 1979, he began to get worried about this patient. She was more confused as to her medication, and appointments. She complained of pain, but forgot to take her medication or lost her prescriptions. She exhibited unusual fluctuations in her weight, which led him to believe Mrs. Mack was not remembering to eat.
Alzheimer's Disease is a progressive, degenerative disease that attacks cells of the brain and results in impaired memory, thinking and behavior. It is the most common form of dementia. Although symptoms vary, most patients experience confusion, poor or decreased judgment, disorientation and changes in behavior of personality.
Alzheimer's Disease is irreversible, which would not allow for the lucid intervals associated with other forms of dementia. The Court therefore is of the opinion that the line of cases which allow for confection of a will during a lucid interval, would not be applicable herein.
The court is of the opinion, that Mrs. Mack presented the classic case study of Alzheimer's patient. She was resourceful and capable throughout most of her lifetime.
Mrs. Mack was born in Ethel, Louisiana August 28, 1899. She lived in New Orleans for many years and worked as a beautician. From all testimony, the deceased had no formal schooling. She did attend night school for a brief time, but stopped attending when she took over the care of her niece, Mrs. Shields, when she was one year old.
Mrs. Mack never had children, but it appears that she was actively involved in supporting family members. Mrs. Shields lived with her aunt until 1957. At the time of Mrs. Mack's death she lived at 3201 St. Thomas Street. Her son Audie, continued to live with Mrs. Mack at 3207 St. Thomas Street until her death. This appears to have been a loving *463 family unit for many years. Neighbors testified to the continuing regard that Mrs. Shields had for this aunt. She paid bills, shopped for groceries, washed clothes and did numerous other chores, including collecting rent from Mrs. Mack's tenant.
In Alzheimer's Disease, the degenerative process is so insidious that relatives and close acquaintances go along for years before recognizing the changes in behavior and personality as disease. Former customers, neighbors, and relatives all testified to Mrs. Mack's mental incapacity.
The court found to be most convincing the testimony of Mrs. Rosalee Smith, the decedent's sister-in-law, who lived in Chicago for many years, and moved back to Baton Rouge about 1980. She described Mrs. Mack as a very pleasant, loving, generous person throughout a 50 year relationship. By 1981 Mrs. Mack had trouble recognizing her former customers, close relatives and friends. Her conversation became repetitive, and she was prone to emotional outbursts, and temper tantrums. Mrs. Edna Chapman, who was the decedent's neighbor and tenant for 33 years testified to the forgetfulness, angry episodes and other changes in Mrs. Mack's personality.
Mrs. Mack was victimized at one point by a con artist. Ms. Shields testified this occurred in 1982 or 1983. After that event, Mrs. Mack became even more suspicious and fearful of going out to take care of her business affairs. Sometime in 1979, Mr. Turner began transporting Mrs. Mack to and from church. By 1982, she offered to give her property to him. The court is convinced from all the evidence that Mrs. Mack offered her property to her sister-in-law, Mrs. Smith, and others who did favors for her. This was a manifestation of the Alzheimer's Disease. Mr. Turner is the only person who took advantage of Mrs. Mack's diminished capacity by taking her to a notary to sign a new will.
The applicable legal principles governing the disposition of this case are that the capacity to make a will is tested at the time the will is made, LSA-C.C. art. 1472; to make a donation the donor must be of sound mind, C.C. art. 1475; there is a presumption in favor of testamentary capacity and a party alleging a lack of capacity has the burden of overcoming the presumption by clear and convincing evidence, a higher standard of proof than mere preponderance of the evidence. Succession of Lyons, 452 So.2d 1161 (La.1984). From our review of the record we conclude that the evidence falls short of being clear and convincing that decedent lacked testamentary capacity on November 14, 1983 when she executed the will.
The trial judge relied in large measure on Dr. Sternberg's testimony in reaching her conclusions. But this testimony does not contain anything to establish mental incompetency when the decedent executed her will. He testified that her senile dementia from Alzheimer's disease eventually rendered her incompetent but it had a gradual onset over a number of years, (Tr. 78) and first manifested itself in the late 1970's when she was forgetting to take her medication. When asked to what extent this incompetency had progressed by November, 1983 he replied:
Well, by this time the patient had begun to lose a considerable amount of weight which I thought was due to just poor eating habits and poor dietary regime at home, it was my understanding that she was living by herself at that time and I don't know that to be a fact. But in any case she had begun to lose weight and as we noted in the office visit, she had begun to become very forgetful about taking her medications and about appointments and things like that. I really at that time didn't sit down and do a examination with a view point of determining her competency, but certainly at that time she was beginning to have trouble.
However, Dr. Sternberg testified that she continued to come alone to his office, he conversed with her about her health, and he gave her instructions about medication. Not until April, 1985 did he ask her to bring a family member with her on her *464 visits so that someone could assist her with her medication. (Tr. 88). Asked by the court when he first suspected that the decedent had Alzheimer's disease he answered in 1986. (Tr. 92). Dr. Sternberg characterized her condition as "a progressive loss of cognitive ability over the years" which was "very marked" in August, 1986 when she was admitted to the hospital for her last illness, "but it began to go bad back I would say in '84 and '85 which is when it became more pronounced anyway." (Tr. 93). No one asked Dr. Sternberg whether she had the mental capacity to make a valid donation in November, 1983 and nowhere in the record did he testify that her mental condition was so bad at this time to support the inference that she was incompetent to make a will. On the contrary, the testimony establishes only that she was getting more forgetful at this time, but her doctor was still willing to treat her alone and to converse and deal with her on a person-to-person basis at the time she made the will.
The trial court also relied heavily on the testimony of two of the lay witnesses who testified about her condition. If this were a case where only a preponderance of the evidence was required to support the judgment we might be less inclined to question its validity but considering the high degree of proof burdening the will's opponent we cannot accept the testimony of these two lay witnesses as sufficient considering the record as a whole.
First of all, in the trial court's discussion of the competency issue there is no mention of the testimony of Joseph Nielsen. The reasons do mention Nielsen in connection with the illiteracy issue, and they indicate that the court was favorably impressed with his testimony. The testimony of the notary has always been regarded as carrying special credence in any dispute as to testamentary capacity. Succession of Dubos, 422 So.2d 444 (La.App. 4th Cir. 1982). We find his testimony concerning decedent's competency to be significant. Nielsen is an attorney and a notary public. He had known decedent for many years and as a notary executed two wills for her, the one in 1975 and the 1983 will with which we are here concerned. He testified that McKensy Turner brought her to his office and he questioned her as to whether she understood she was revoking her previous will and was leaving everything to Turner. He said he had never met Turner before. Before he executed the will Nielsen said to decedent, "This [Turner] is not a member of your family, do you understand that you have a right to give your possessions to whomever you wish, but you're under no threat or anything?" She replied "No, I'm not" and according to Nielsen was upset because he was asking her these questions. Nielsen was asked whether there was any question in his mind about her mental capacity to make a will and he replied in the negative.
In addition to overlooking, without discrediting Nielsen's testimony, the trial court's reliance on the testimony of only two lay witnesses out of an array of witnesses called by both sides seems inconsistent with the principle that the opponent had to prove incompetency by clear and convincing evidence and not by a mere preponderance.
In any event, we have concluded from the testimony of Dr. Sternberg and Mr. Nielsen along with all of the lay witnesses that the opponent failed to overcome by clear and convincing evidence the presumption of decedent's testamentary capacity on November 4, 1983 when she executed her will; and we have concluded that the trial court's judgment in this regard is manifestly erroneous.
Opponent argues that this court should not disturb the findings of the trial court and cites an array of will contest cases which affirmed judgments of the trial court. However, an analysis of each case not only distinguishes it from the instant case but buttresses the conclusion we have reached as to insufficiency of evidence.
In Succession of Brown, 251 So.2d 465 (La.App. 1st Cir.1971) the court rejected an attack on a will. The court of appeal agreed with the trial court's conclusion that, although decedent was gravely ill and suffering from numerous serious disorders, she possessed testamentary capacity at the *465 time she executed the will. The court accepted the testimony of the notary and several lay witnesses over that of a physician and other lay witnesses. As already noted in the instant case the trial judge apparently disregarded the notary's testimony.
In Succession of Kelly, 305 So.2d 704 (La.App. 2d Cir.1974) the court's declaration of the will's invalidity was based on the treating physician's testimony that decedent could not possibly have had the mental capacity to execute a will. As already discussed, Dr. Sternberg's testimony contains no statement that decedent was incompetent when she made her will.
In Succession of Dubos, supra, the court in upholding a second will noted that the testimony of the notary was especially significant compared to adverse witnesses who were not present when the will was made.
In Succession of Keel, 442 So.2d 691 (La.App. 1st Cir.1983) the annulment of a will was upheld where the will was executed in the hospital three weeks before decedent died, lay witness testified he was disoriented and unresponsive and two physicians said he was not mentally competent to make a will. Even though the notary testified decedent was competent this notary had never met the decedent before. These facts stand in sharp contrast to ours.
In Succession of Poynot, 461 So.2d 1070 (La.App. 4th Cir.1984), writ denied 466 So.2d 468 (La.1985) this court affirmed the will's annulment because medical expert and lay testimony furnished abundant proof of incapacity.
Finally, in Succession of Sauls, 510 So.2d 715 (La.App. 1st Cir.1987) the trial court's upholding of the will was affirmed because the opponent produced no evidence of incapacity on the day the will was drawn to rebut the proponent's evidence of competency.
The next issue is whether the decedent was able to read and write. If not, the form of the will, execution before a notary and two witnesses, was invalid. R.S. 9:2442, 2443. In order to prevail on this issue the opponent was subjected to the standard of proof beyond a reasonable doubt. Succession of McKay v. Mount, 449 So.2d 189 (La.App. 3rd Cir.1984). The trial court did not specifically rule on this issue but was apparently convinced that the opponent failed to carry the burden of proving decedent's illiteracy beyond a reasonable doubt. We are likewise convinced that the opponent failed to carry this burden. Nielsen testified that he observed the decedent writing out cooking recipes many times. As the trial court noted, numerous other witnesses testified that she could read. The record does not support a finding that decedent was illiterate.
The third issue raised by the opponent is Turner's alleged incapacity to be a legatee under C.C. art. 1489 because he was a minister of religious worship who attended decedent during the sickness of which she died and because the legacy was made to her during that sickness. In order for this article to apply it must be clear that the will was made during the last illness. Decedent made the will in November, 1983 and died in September, 1986. During the intervening period she was not hospitalized or even bedridden. On the contrary she was cooking, having guests, entertaining, participating in church activities and getting about freely. The record does not show that she was chronically ill when she made the will. Had she made the will during her final hospitalization a different result might obtain, but under the circumstances of this case art. 1489 has no application. Coleman v. Winsey, 183 So. 2d 118 (La.App. 1st Cir.1965), writ refused 248 La. 1101, 184 So.2d 25 (1966).
Accordingly the judgment of the trial court is reversed and set aside and there is judgment in favor of McKensy Turner, and against Audie Shields, dismissing his petition at his cost. The decree of probate as to the statutory will of decedent executed on November 14, 1983, is reinstated. All costs are assessed against Audie Shields.
REVERSED AND REMANDED.