649 So.2d 23 (1994)
SUCCESSION OF Diane "Polly" McGhee CHRISTENSEN.
No. 94 CA 0263.
Court of Appeal of Louisiana, First Circuit.
December 22, 1994.
Writ Denied April 7, 1995.
Victoria L. Bartels, New Orleans, for appellant, Cheryl Christensen Gooch.
*24 R. Scott Buhrer, New Orleans, for appellees, Diane Reddoch and Bonnie Rawlins.
Before GONZALES, FOGG and PARRO, JJ.
GONZALES, Judge.
This is a contest regarding a testamentary will provoked by Bonnie Christensen Rawlins (Bonnie) and Diane Christensen Reddoch (Diane), daughters of the decedent, Diane "Polly" McGhee Christensen (Mrs. Christensen), on the ground that Mrs. Christensen lacked testamentary capacity when she wrote an olographic testament on November 15, 1990, leaving her entire estate to a third daughter, Cheryl Christensen Gooch (Cheryl).[1] Alternatively, Diane and Bonnie attack the validity of the testament based on the alleged undue influence asserted by Cheryl over Mrs. Christensen.
The trial court declared the olographic testament invalid based on its finding that Mrs. Christensen lacked testamentary capacity on November 15, 1990. The trial court found it unnecessary to reach a decision on the issue of the alleged undue influence exerted over Mrs. Christensen by Cheryl. Cheryl appeals the decision of the trial court.

FACTS
In February of 1989, Mrs. Christensen was diagnosed with a mild to moderate case of Alzheimer's disease by Dr. Patricia Cook, a neurologist. By February of 1990, Dr. Cook's diagnosis was that Mrs. Christensen had definitely progressed to a moderate stage of the disease; and in May of 1991, Dr. Cook found that although Mrs. Christensen remained in a moderate stage, the disease had further progressed. Based on her observations of Mrs. Christensen from the visits of February 1990 and May 1991, Dr. Cook testified at trial that Mrs. Christensen would not have been able to understand the ramifications of executing a testament on November 15, 1990.
On November 15, 1990, the day Mrs. Christensen executed the testament, she had contact with three persons: (1) Scarlett Johnson,[2] a sitter who had spent the previous night with her and who escorted her from her home in Covington, Louisiana, to New Orleans for two appointments; (2) William Wessel, the attorney at whose office the testament was executed; and (3) Cheryl, who met Ms. Johnson and Mrs. Christensen to go to the doctor's office and then to Mr. Wessel's office.
According to Ms. Johnson, who testified at trial, Mrs. Christensen was unable to dress herself on November 15, 1990 and could not remember why they were going to New Orleans. Once they arrived at Mr. Wessel's office, Ms. Johnson was instructed to remain in the lobby while Mrs. Christensen and Cheryl proceeded with Mr. Wessel to another part of the office. Ms. Johnson remained in the lobby for approximately 45 minutes to 1 hour.
William Wessel also testified at the trial. Regarding Mrs. Christensen's visit, Mr. Wessel testified that her primary purpose was to retrieve some jewelry left with him by either Bonnie or Diane; however, after giving the jewelry to Mrs. Christensen, Mr. Wessel asked Cheryl to leave the room so that he and Mrs. Christensen could discuss her desire to execute a testament.
After learning of Mrs. Christensen's wish to leave all of her property to Cheryl, Mr. Wessel attempted to discourage her from writing a testament to this effect. He reminded her that her deceased husband, with whom Mr. Wessel had practiced law, had left the disposable portion of his estate equally to the three daughters and encouraged Mrs. Christensen to do the same. Mrs. Christensen clearly told Mr. Wessel that she was aware of what her husband had done but still wanted to leave all of her property to Cheryl. Mrs. Christensen told Mr. Wessel that Diane had treated her badly and did not need the money but that Cheryl needed the money. Mr. Wessel could not recall the reason given by Mrs. Christensen for not leaving anything *25 to Bonnie. Mr. Wessel was not aware that Mrs. Christensen had previously executed a testament in May of 1990, leaving her estate equally to her three daughters.
After discussing her options with her, Mr. Wessel left Mrs. Christensen alone with two drafts of a testamentone leaving all of her estate equally to her three daughters and one leaving it solely it Cheryl. While alone, Mrs. Christensen executed an olographic testament, proper in form, which is reproduced below:

When Mr. Wessel returned to the room, Mrs. Christensen was reviewing the testament she had just copied from the draft she had chosen and remarked to him that she made the mistake of leaving the word "last" out of the text she had copied. She asked Mr. Wessel whether she should rewrite the entire testament, but upon his suggestion, chose to merely insert the omitted word at its proper place in the first sentence of the testament. It can also be seen that Mrs. Christensen underlined the word "all" in the second sentence of the testament. According to Mr. Wessel, the underline was not contained in the draft he gave Mrs. Christensen to copy, nor did he suggest that she include the underline.
As is evident from the above reproduction, Mrs. Christensen revoked the former testament leaving her estate equally to her three daughters, gave all of her property to Cheryl, and appointed Cheryl as executrix of her estate. Although he admitted that Mrs. *26 Christensen's mind "wandered off" from time to time, Mr. Wessel clearly testified that on November 15, 1990, he had no problem with Mrs. Christensen's ability to confect a testament and believed that she had the "mental capacity to understand what she was doing and [to understand] the length and [breadth] of her estate." Mr. Wessel also stated that there "was no question in [his] mind" that Mrs. Christensen fully understood that Bonnie and Diane were not going to get any part of her estate as a result of the testament she had executed.[3]
Cheryl testified that on November 15, 1990, her mother was aware that she owned her own home, aware that she had ample money to maintain herself in her home for her lifetime, and knew that the money was located in a particular account. Cheryl further testified that she did not suggest to her mother on November 15, 1990, or at any time before that, that she should change her testament to leave all of her property to Cheryl.
In addition to the testimony summarized above, several other witnesses testified regarding their impressions of the mental capacity of Mrs. Christensen in the few years preceding her death on March 10, 1993. Among these witnesses were several persons employed as sitters for Mrs. Christensen between the years of 1990 and 1993. As noted by the trial court in its written reasons for judgment, "[t]he testimony of the different sitters produced by both the proponent and opponents of the will is in direct opposition to each other, to such an extent that it is irreconcilable." For example, the testimony of Sonja Johnson and Sheila McCarron, two of Mrs. Christensen's sitters, indicates that, as early as March or April of 1990, Mrs. Christensen could not remember anything and could not do much for herself. On the other hand, Marion Treadway, another sitter employed from September of 1991 until Mrs. Christensen's death, testified that Mrs. Christensen was different from other Alzheimer's patients that she sat with, in that Mrs. Christensen "knew things," was aware of what was going on around her, and always knew the people around her. Ms. Treadway's testimony is supported by the testimony of another sitter, Linda Walton Pal, who was employed from approximately September of 1990 through January of 1992. According to Ms. Walton Pal, in at least the first 6 months of her employ, Mrs. Christensen did not appear confused, recognized and was able to converse with her daughters and other visitors, and was able to discuss programs she watched on television. Ms. Walton Pal stated that Mrs. Christensen's condition began to rapidly deteriorate when she was prescribed the medication Haldol,[4] which was in April of 1991.
Further, the testimony of Reverend Raymond Scheer, the pastor of Mrs. Christensen's church who visited her regularly in the last years of her life, indicates that up until the last 3 to 6 months of her life, Mrs. Christensen always recognized him, was able to "tell [him] exactly what she felt or what she wanted," and was able to carry on involved conversations with him.
Additionally, the testimony of Laverne Pornici, a niece of Mrs. Christensen and with whom Mrs. Christensen maintained a close relationship until her death, demonstrates that throughout 1990 and into 1991, Mrs. Christensen was oriented, had no problems with maintaining concentration during conversations, and was able to express what she wanted to do and what she did not want to do.

TESTAMENTARY CAPACITY
As noted by the trial court, the standard for determining testamentary capacity in this case is governed by former Civil Code article 1475 which stated that "to make a donation either inter vivos or mortis causa, *27 one must be of sound mind;"[5] and under former Civil Code article 1472, it is sufficient if the capacity of giving exists at the moment the donation is made.[6] To determine the existence of a "sound mind," the question is whether the testator understood the nature of the testamentary act and appreciated its effects. Succession of Lyons, 452 So.2d 1161, 1164 (La.1984); Succession of Easterly, 563 So.2d 1006 (La.App. 1st Cir.1990).
The burden of proving lack of testamentary capacity is upon the party alleging it. Succession of Lyons, 452 So.2d at 1164; Succession of Easterly, 563 So.2d at 1006-1007. There is a presumption in favor of testamentary capacity and the validity of a testament is to be upheld whenever possible. Atkins v. Roberts, 561 So.2d 837, 840 (La. App. 2d Cir.1990). It has been established by the Supreme Court that this presumption in favor of testamentary capacity continues until rebutted by clear and convincing evidence to the contrary. Succession of Lyons, 452 So.2d at 1164-1166. What constitutes clear and convincing evidence requires more proof than a preponderance of the evidence but less stringent proof than the criminal standard of beyond a reasonable doubt. Neuberger, Coerver & Goins v. Times Picayune Publishing Co., 597 So.2d 1179, 1183 n. 4 (La.App. 1st Cir.1992); Succession of Sauls, 510 So.2d 715, 717 (La.App. 1st Cir.), writ denied, 513 So.2d 1214 (La.1987). To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Succession of Dowling, 93-1902 (La.App. 4th Cir. 2/25/94); 633 So.2d 846, 855.

REVIEW OF TRIAL COURT'S FINDINGS
Testamentary capacity is solely a question of fact to be determined by the trial court and its finding should not be disturbed on appeal in the absence of manifest error. Succession of Sauls, 510 So.2d at 717; Succession of Sullivan, 509 So.2d 844, 848 (La. App. 1st Cir.1987). In evaluating the evidence before it, the trial court determined that the testimony of Dr. Cook and Scarlett Johnson was the "most helpful" in resolving the dispute regarding Mrs. Christensen's testamentary capacity. Although the testimony of these two witnesses may favor a finding that Mrs. Christensen lacked the capacity to execute a testament on November 15, 1990, it does not constitute sufficient evidence to meet the demanding level of proof required under the clear and convincing standard. Even when coupled with other evidence in the record which would support the testimony of Dr. Cook and Ms. Johnson, we find that the opponents of the testament failed to prove that it is "highly probable" and much more probable than not that Mrs. Christensen lacked the testamentary capacity to execute the November 15, 1990 testament.
Our conclusion is buttressed by evidence which clearly contradicts a finding of lack of capacity; that is, the testimony of several witnesses who had contact with Mrs. Christensen indicates that on November 15, 1990, she was capable of understanding the nature of the testamentary act she wrote in her own handwriting and that she also appreciated its effects. In addition, the trial court's primary reliance on the testimony of only two witnesses out of an array of witnesses called by both sides is inconsistent with the principle that the opponents had to prove lack of testamentary capacity by clear and convincing evidence and not by a mere preponderance. See Succession of Mack, 535 So.2d 461 (La.App. 4th Cir.1988), writ denied, 539 So.2d 633 (La.1989). Thus, in light of the presumption in favor of testamentary capacity and the high burden of proof imposed on the opponents to Mrs. Christensen's testament, we find that the trial court *28 committed manifest error in finding that the November 15, 1990 testament of Mrs. Christensen was null and void due to a lack of testamentary capacity at the time she executed the testament.

UNDUE INFLUENCE
Based on its finding that Mrs. Christensen lacked the testamentary capacity to execute the November 15, 1990 testament, the trial court found it unnecessary to reach a decision on the issue of the alleged undue influence exerted over Mrs. Christensen by Cheryl. Because we reverse the trial court's decision regarding the testamentary capacity issue, and because we have the entire record before us, we are now required to decide ab initio the issue of undue influence. Gonzales v. Xerox Corporation, 320 So.2d 163 (La. 1975).
At the time of the execution of Mrs. Christensen's November 15, 1990 testament, former Civil Code article 1492 provided that "[p]roof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation."[7] However, interpreting the proscription of article 1492 prior to its repeal, this court has held that evidence of undue influence will be admitted to nullify a will only if such undue influence was present at the time of making the will. Succession of Sauls, 510 So.2d at 717; see also Succession of Dowling, 633 So.2d at 855.
Although the record establishes that Cheryl was present at Mr. Wessel's office at the time Mrs. Christensen executed the testament, Mr. Wessel testified that he asked Cheryl to leave the room when the issue of writing a testament arose. Mr. Wessel also testified that he left Mrs. Christensen alone with the two sample testaments after discussing her options with her. The opponents to the testament have pointed to no evidence in the record, nor have we found any, to indicate that Cheryl was present when Mrs. Christensen chose to copy the sample testament leaving all of her estate to Cheryl. Thus, we find that the opponents have failed to establish that the undue influence of Cheryl resulted in the invalidity of Mrs. Christensen's testament.

DECREE
For the above reasons, we REVERSE the judgment of the trial court wherein it found that the November 15, 1990 testament of Mrs. Christensen was null and void due to a lack of testamentary capacity. We REMAND the case to the trial court for proceedings consistent with the views expressed herein. In remanding this case, we express no opinion on the efficacy of the November 15, 1990 testament in light of the forced heirship law. Costs of this appeal are to be borne by the opponents, Bonnie Christensen Rawlins and Diane Christensen Reddoch.
NOTES
[1] Cheryl Christensen Gooch is referred to as both "Cheryl" and "Cher" throughout the record. For consistency, she will be referred to as "Cheryl" in this opinion.
[2] Ms. Johnson was a substitute sitter for Mrs. Christensen on 6 or 7 occasions in the fall of 1990.
[3] In his written reasons for judgment, the trial court's only reference to Mr. Wessel's testimony relates to Mr. Wessel's lack of knowledge that Mrs. Christensen was suffering from Alzheimer's disease on November 15, 1990 and to his observation that Mrs. Christensen's demeanor "did not show in any way that she did not comprehend her actions." In brief, the opponents to the will argue that the trial court's failure to give more weight to Mr. Wessel's testimony hinges on his lack of credibility made evident during cross-examination.
[4] Haldol is a drug used in the management of manifestations of psychotic disorders. Physicians' Desk Reference at 1422. (47th edition 1993).
[5] The standard for testamentary capacity was changed in 1991 and is embodied in current Civil Code article 1477 which requires that "a person must ... be able to comprehend generally the nature and consequences of the disposition that he is making" to have capacity to make a donation inter vivos or mortis causa. Acts 1991, No. 363, § 1.
[6] Former Civil Code article 1472 has been replaced by current Civil Code article 1471 which states in part: "Capacity to donate mortis causa must exist at the time the testator executes the testament." Acts 1991, No. 363, § 1.
[7] Article 1492 was repealed by Acts 1990, No. 147, § 3. Because of the uncertainty as to the effect of repealing the prohibition against admission of proof of "hatred, anger, suggestion or captation," a new provision, Article 1479, was enacted by Acts 1991, No. 363, § 1, which provides that a donation mortis causa "shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donor." However, because the enactment of Article 1479 effected a substantive change, we apply the law in effect at the time the testament was written. Succession of Dowling, 633 So.2d at 855.