923 So.2d 642 (2005)
SUCCESSION OF Patricia Lee Davis CRAWFORD.
No. 2004 CA 0977.
Court of Appeal of Louisiana, First Circuit.
September 23, 2005.
Richard M. Michalczyk, Cronvich, Wambsgans & Michalczyk, Metairie, for Defendant-in-Rule/Appellee Alwynn J. Cronvich, Executor of the Succession of Patricia Crawford.
*643 Harold E. Molaison, Bruce A. North, Molaison & Greenberg, L.L.C., Gretna, for Plaintiff-in-Rule/Appellant Garrett Crawford.
Before: PARRO, KUHN, and WELCH, JJ.
PARRO, J.
Garrett Crawford, son of the decedent/testatrix, appeals from a summary judgment in favor of the executor of his mother's succession, dismissing his rule to oppose or annul the testamentary documents executed by his mother on the grounds that he did not establish that he could meet his burden of proof at trial by clear and convincing evidence that the testatrix lacked testamentary capacity. For the following reasons, the judgment is affirmed.

Factual and Procedural Background
On June 28, 2002, Patricia Lee Davis Crawford, who was suffering from cancer, executed a statutory testament, which, in pertinent part, provided:
I have been married but twice .... There were no children born of the first marriage and there was one child born of the second marriage, namely, Garrett Glen Crawford, II. I have had no other children, have adopted no one, nor have I been adopted. I have not seen my son since 1995 and I hereby disinherit him and leave nothing to him.
She followed with particular legacies to John B. Wascom and the Bridge House. In this testament, the "rest and remainder of [her] estate" was bequeathed to the Mississippi Gulf Coast Community College Foundation, Inc. to provide scholarships for needy students attending Mississippi Gulf Coast Community College at the Perkinston campus.
The testament was revised by a codicil, in olographic form, dated August 1, 2002, in which Ms. Crawford revoked the legacy to Mr. Wascom, since the automobile previously bequeathed to him had been stolen. She added particular bequests to Kim Thibodaux of her pet dog and a specified sum of money for the care of the dog. Otherwise, the provisions of her June 28, 2002 testament remained unchanged. Ms. Crawford died shortly afterwards on August 22, 2002.
After these documents were submitted for probate by the named testamentary executor, Ms. Crawford's only child, Garrett Crawford (Garrett), moved to annul the probated statutory testament and the olographic codicil pursuant to LSA-C.C.P. art. 2931, on the ground that Ms. Crawford lacked the requisite capacity to execute the testamentary documents. His objection was based on an incurable mental condition  schizophrenia with paranoiathat Ms. Crawford had been diagnosed with some years earlier, which he alleged had made her delusional about him and rendered her incapable of rational decisions concerning the disposition of her property to him.
Subsequently, the succession representative moved for summary judgment on the issue of capacity. In support of his motion, the succession representative offered the affidavits of the following individuals, all of whom declared that they had had contact with Ms. Crawford during the last year of her life: Dr. Michael Mahoney (Ms. Crawford's treating psychiatrist), Alma Lee Carpenter (her half-sister), James H. Lee (her half-brother), Sara Lee (her sister-in-law), Tammy Marshall (her banker), Brian T. Bernos (her attorney's legal assistant), Alwynn J. Cronvich (the independent testamentary executor of her succession), Richard M. Michalczyk (her attorney and notary), Kimberly Thibodaux *644 (an employee of Progressive Funeral Services), and Donna and David Hodge (her neighbors and landlords).
Dr. Mahoney, a psychiatrist employed by the Jefferson Parish Mental Health Center, averred that he had treated Ms. Crawford when she was briefly hospitalized for an "episode" in 1999. Afterwards, he continued to see her on an out-patient basis every three months, with the last visit occurring two months prior to her death. In Dr. Mahoney's opinion, after her release from the hospital in 1999, Ms. Crawford "had no further episodes, was capable of taking care of her own affairs, making her own decisions, writing Wills, was no danger to herself or others, and was sane."
Ms. Carpenter declared that she and Ms. Crawford communicated by telephone at least three times each week when they were not together. She had visited and lived with Ms. Crawford during Thanksgiving 2001 and March, June, and August 2002, and was living with Ms. Crawford when she died. During the time that she communicated and lived with her, Ms. Crawford "attended to all of her own affairs, paying bills, making appointments, purchasing the mobile home, and making arrangements for renting the property on which the mobile home was to be placed, and decisions on all other matters that might have been necessary." According to Ms. Carpenter, Ms. Crawford "was capable of attending to all of her own affairs and was as balanced and sane as anyone [she] had ever known."
Mr. Lee said he had visited with Ms. Crawford on many occasions during the last years of her life and had spoken with her frequently by telephone. He stated that "at all times that he was in contact with [Ms. Crawford] she was coherent, was capable of making her decisions, and did so; she was in control and clear in her thinking; to say that she was anything but sane is absurd." Aware of the serious nature of her illness, she told him where she wished to be buried and gave him a letter with instructions for her funeral and burial, a copy of which was attached to his affidavit. Her letter closed with the comment, "I do not care for flowersflowers are for the living."
Sara Lee also said that she had visited Ms. Crawford on several occasions and had spoken with her frequently by telephone. She stated that Ms. Crawford "made her own decisions and was capable of doing so;... was an intelligent lady and was aware of everything at her death and was sane."
The executor of her succession, Alwynn J. Cronvich, averred that Ms. Crawford first contacted him in October 2001, after learning that she had cancer, and asked him to administer her estate. He lived in Mississippi, and referred her to Mr. Michalczyk to explain Louisiana's forced heirship and succession law and to discuss the provisions of her will. She discussed her illness with Mr. Cronvich and gave him explicit instructions concerning her burial. Mr. Cronvich stated she was competent to write a will, noting:
Appearer has had many contacts with persons suffering from mental illnesses, and has represented clients in interdiction and commitment proceedings over the years; Mrs. Crawford exhibited none of the symptoms of a person suffering from Schizophrenia or paranoia.
Mr. Michalczyk declared that he had advised Ms. Crawford on the laws of succession and forced heirship. According to Mr. Michalczyk, she understood the purpose for writing a testament and was decisive and clear in her intentions pertaining to her testament. Ms. Crawford had informed him that she wanted the bulk of her estate to go to charity. She was also interested in the care of her pet dog. He *645 said Ms. Crawford was adamant that no bequest be made to her son, and requested that the testament contain language specifically disinheriting him. Mr. Michalczyk averred that the "statutory Will was read by [him], it was clearly understood and it was not complicated." He explained that the testament and codicil reflected Ms. Crawford's intention. His legal assistant, Brian T. Bernos, described his own communications with Ms. Crawford since August 1999 concerning her illness, her determination to "win her battle with cancer," and her legal matters. He confirmed that she "was completely in control of her senses, very pleasant and neat in her appearance, was capable of making her own decisions, and certainly knew what she was doing."
Her banker, Tammy Marshall, stated she had handled Ms. Crawford's banking activities and needs during 2001 and 2002, during which time Ms. Crawford was knowledgeable about her own accounts and banking needs. Ms. Marshall further averred that Ms. Crawford "was capable of taking care of her own affairs and at no time indicated otherwise."
Kimberly Thibodaux described the arrangements Ms. Crawford had made at Professional Funeral Services concerning her impending death and burial. She said Ms. Crawford personally wrote the burial contract and provided complete instructions concerning where she was to be buried, being "quite explicit about all aspects of the management of the entire burial process from death to actual burial." Ms. Thibodaux's relationship with Ms. Crawford spanned several years before her death, during which time Ms. Crawford was "quite capable of managing all her own affairs, making decisions for her future, and was sane."
Donna Hodge, an assistant coroner in Washington Parish who dealt with commitment of mental patients in her job, said she and her husband owned the property where Ms. Crawford lived in her mobile home. Ms. Hodge said she and her husband lived nearby and Ms. Crawford's home was clearly visible from their home. She said she had daily contact with Ms. Crawford, who was rational, capable of making her own decisions, aware of her medical condition, exhibiting no symptoms of mental illness, and sane. David Hodge stated he is also an assistant coroner in Washington Parish and, in the scope of his employment, has taken into custody and transported persons to mental institutions on the coroner's commitment orders. During his almost daily contact with Ms. Crawford, she did not exhibit any of the characteristics of those persons he had helped to transport. He reiterated his wife's opinion concerning Ms. Crawford's mental abilities and sanity.
In support of his opposition to the pending motion, Garrett offered his own affidavit regarding his mother's prior mental history, the affidavit and report of clinical psychologist Brian T. Jordan, Ph.D., and numerous excerpts from his mother's medical records that were referenced in Jordan's report. In his affidavit, Garrett stated that for his entire adult life, he had been aware of his mother's mental infirmities. As a result of her illness and delusional states, she had accused him of trying to interdict her, take her home from her, and kill her; she had also said he had raped her and done "terrible" things to her, none of which was true. He said that in 1996, his mother had threatened to kill him and his wife if they tried to come onto her property. Despite this, he continued to try to maintain contact with her, but she would not accept his phone calls.
Jordan had reviewed Ms. Crawford's psychiatric history and prepared a report of his findings, opinions, and conclusions as *646 to Ms. Crawford's capacity. In an overview, Jordan observed:
All of the patient's ten (10) psychiatric hospitalizations were the result of Judicial commitment due to her frequent deteriorated and psychotic functioning. The consistent diagnosis over her lifetime was first established in 1964 at Southeast Louisiana Hospital as Schizophrenia, Paranoid Type. Over the years a clear pattern emerges in her paranoid delusions, which focus on immediate family members, such as her ex husband Jerry Crawford and later her son Garrett, as well as other family members.
Ms. Crawford's last hospitalization as a result of judicial commitment was in June 1999, three years before the execution of the testament. Prior to and since that time, she had received outpatient treatment at East Jefferson Mental Health Center. Jordan noted that over the years, her condition fluctuated from "floridly psychotic and deteriorated" to presenting a reasonably good image, stating:
Mrs. Crawford had the ability to present a normal facade to her attorney, which was not supported by the treatment notes at the time, which indicated that in fact she continued to have paranoid thoughts of her son stealing to a point of refusing him visitation at the hospital.[1] It is also significant to note that mental health center treatment notes during 2001 show her to be denying any delusions or mental problems, but nevertheless, expressing delusions that her son was still illegally entering her home. Treatment notes as late as 7/22/02 show her to be accusing her oncologist of harassing her with phone calls to come back for treatment and Mrs. Crawford asking her attorney to write him a letter to discontinue doing this.
In analyzing Ms. Crawford's ability to execute a testament, Jordan stated:
Treatment notes clearly show that Mrs. Crawford had the ability at times to present a facade of being rational and oriented to time, place and person. The records however, clearly underscore a continuation of her fixed delusional thoughts concerning her son Garrett. The treatment records further contain a number of professional opinions as seeing her as having the ability to hide her delusional thoughts at times and not express them openly. These records further demonstrate that her fixed delusional thoughts regarding her son Garrett existed for at least twenty-two (22) years. All of the professionals treating the patient view these thoughts as delusional with no basis in reality. A separate recent clinical evaluation of Garrett Crawford further disclosed no actions or behaviors on his part that would substantiate his mother's delusions that he was harming her in various ways.
In summary, clinical evidence would present a well documented challenge to Mrs. Crawford's capacity to execute a last will and testament disinheriting her son Garrett. Specifically, her cognitive ability to comprehend the nature and consequences of disinheriting her son arose from her fixed delusional thoughts regarding their relationship. The outpatient treatment notes of 6/14/02 ... showed these delusional thoughts to be existing at or about the time she executed her will. For this reason, her mental illness seriously impaired her perception and understanding of her son and his intentions toward her. If her delusions regarding her son did not exist, there is no evidence at hand that would substantiate her wishing to disinherit him.
*647 At the close of the hearing on the motion for summary judgment, the trial court recognized that there is an assumption in favor of testamentary capacity and that the person challenging the capacity of the testatrix must prove by clear and convincing evidence the lack of capacity at the time of the execution of the testament. In considering the evidence that had been offered, the trial court noted the following: Garrett had been estranged from his mother for many years and admittedly had not been in contact with her at the time the testamentary documents were executed; the clinical psychologist who reviewed Ms. Crawford's medical record had never had any contact with her and failed to address whether, given Ms. Crawford's mental state, she could have had lucid intervals; the psychiatrist who had treated Ms. Crawford on a regular basis for the last three years of her life, with at least one visit during the time period in question, averred that Ms. Crawford was sane and was capable of taking care of her own affairs, making her own decisions, and writing a testament.
Based on the assumption in favor of the testatrix's capacity and the evidence offered in support of Ms. Crawford's capacity, the trial court found that the information offered by Garrett in opposing the motion was insufficient to prove by clear and convincing evidence that Ms. Crawford lacked testamentary capacity. Accordingly, summary judgment was granted in favor of the succession representative, and Garrett's rule to oppose or annul Ms. Crawford's testament was dismissed. From that judgment, Garrett appealed, contending that summary judgment was improper in light of the conflicting evidence as to Ms. Crawford's capacity, which gave rise to a genuine issue of material fact. He also urged that the trial court erred in applying the burden of proof established by the 2003 amendments to Louisiana Civil Code article 1482, rather than the burden of proof in effect on the date of Ms. Crawford's death in 2002.

Discussion
Capacity to donate mortis causa must exist at the time the testator executes the testament. LSA-C.C. art. 1471. To have capacity to make a donation mortis causa, a person must be able to comprehend generally the nature and consequences of the disposition that he is making. LSA-C.C. art. 1477. There is a presumption in favor of testamentary capacity. Succession of Lyons, 452 So.2d 1161, 1164 (La.1984). A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor executed the testament. LSA-C.C. art. 1482(A). To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence. Louisiana State Bar Association v. Edwins, 329 So.2d 437, 442 (La.1976); Succession of Sanders, 485 So.2d 126, 132 (La.App. 2nd Cir.), writ denied, 487 So.2d 443 (La.1986). Paragraphs B and C of Article 1482 make exceptions relative to the burden of proof when a person has been judicially interdicted.
Garrett maintains on appeal that the trial court erred in imposing the standard of proof set forth in current Article 1482, rather than the pre-2003 version, since the current version was not in effect on the date of Ms. Crawford's death. Prior to the amendment of Article 1482 by 2003 La. Acts, No. 1008, § 1, an exception concerning the presumption of capacity and burden of proof was made for persons judicially declared to be mentally infirm. LSA-C.C. art. 1482, Revision Comments  *648 1991, comment (a). In particular, LSA-C.C. art. 1482 then provided:
A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation inter vivos or executed the testament. However, if the donor made the donation or executed the testament at a time when he was judicially declared to be mentally infirm, then the proponent of the challenged donation or testament must prove the capacity of the donor by clear and convincing evidence.
Thus, when a judicial determination of mental infirmity of the testator existed, there was a presumption that the testator lacked capacity, and the burden of proof itself shifted to the proponent of the testament to overcome that presumption by clear and convincing evidence. LSA-C.C. art. 1482, Revision Comments1991, comment (b).
However, the 2003 amendment to Article 1482 altered the burden of proof with respect to the issue of testamentary capacity, eliminating the "burden-shifting" language. The amendment was procedural in nature, inasmuch as it concerns an evidentiary matter, and is, therefore, entitled to retroactive application. See Succession of Duboin, 94-446 (La.App. 3rd Cir.11/2/94), 649 So.2d 617, 619.[2] Therefore, the law in effect on the date of trial governs the standard of proof, even though the will was executed and the testatrix had died prior to the amendment. Id. at 619. Since the hearing on the motion for summary judgment occurred after the effective date of the 2003 amendment, we conclude the trial court applied the correct burden of proof in this case. The only exceptions in the current version of Article 1482 apply to the capacity of persons under full or limited interdiction. Absent any evidence that Ms. Crawford was an interdict at the time of the execution of the will, we conclude that the trial court properly placed the burden of proof on Garrett, the person challenging the capacity of a donor.
Relative to the motion for summary judgment, the initial burden of proof is on the moving party. However, on issues for which the moving party will not bear the burden of proof at trial, the moving party's burden of proof on the motion is satisfied by pointing out to the court that there is an absence of factual support for one or more elements essential to the adverse party's claim, action, or defense. Thereafter, the nonmoving party must produce factual support sufficient to establish that it will be able to satisfy its evidentiary burden of proof at trial; failure to do so shows that there is no genuine issue of material fact. LSA-C.C.P. art. 966(C)(2); Clark v. Favalora, 98-1802 (La.App. 1st Cir.9/24/99), 745 So.2d 666, 673.
In light of the presumption of testamentary capacity and the evidence presented by the executor, the initial burden on the moving party was satisfied. Since Garrett had the burden of proving by clear and convincing evidence at trial that Ms. Crawford lacked capacity when the testament and codicil were executed, he was required to produce factual support sufficient to establish that he would be able to satisfy his evidentiary burden of proof at trial on that issue. Thus, in opposing the motion for summary judgment, he had to show by clear and convincing evidence that Ms. Crawford was unable to comprehend *649 generally the nature and consequences of the testament when the testamentary documents were executed.
Garrett presented evidence that Ms. Crawford suffered from schizophrenia, paranoid type, which caused her to have delusional thoughts about him. He urged that absent these delusional thoughts, Ms. Crawford would have had no basis for wanting to disinherit him. However, proof of the presence of a mentally-debilitating condition at the approximate time that the testament was executed is insufficient to prove by clear and convincing evidence the lack of testamentary capacity at the time the testament was executed, especially where there is contrary evidence of the decedent's capacity at the actual time the testament was executed. See In re Succession of Culotta, 04-1298 (La.App. 5th Cir.3/1/05), 900 So.2d 137, 143, writ denied, 05-0817 (La.5/13/05), 902 So.2d 1024; Succession of Braud, 94-0668 (La.App. 4th Cir.11/17/94), 646 So.2d 1168, 1171, writ denied, 95-0383 (La.3/30/95), 651 So.2d 841; Succession of Christensen, 94-0263 (La.App. 1st Cir.12/22/94), 649 So.2d 23, 27-28, writ denied sub nom. Succession of McGhee, 95-0234 (La.4/7/95), 652 So.2d 1346. Nonetheless, we are mindful that the trial court cannot make credibility determinations on a motion for summary judgment. Independent Fire Ins. Co. v. Sunbeam Corp., 99-2181 (La.2/29/00), 755 So.2d 226, 236.
Since Garrett was not a forced heir,[3] he was not entitled to a forced portion of Ms. Crawford's estate. See LSA-C.C. art. 1495. Ms. Crawford was free to do as she wished with her property by donation mortis causa. See LSA-C.C. art. 1497. In the introductory paragraph of her testament, Ms. Crawford made it clear that she did not want Garrett to inherit any portion of her estate, based on the fact that they were estranged. Although the record shows that Ms. Crawford suffered from a condition known as schizophrenia, paranoid type, Garrett has not come forward with evidence that this condition prevented his mother from understanding the nature and consequences of her actions. The affidavits of Garrett and Jordan only confirm that Ms. Crawford suffered from schizophrenia, paranoid type, which caused her to have delusional thoughts about him; those affidavits do not conflict with the other affidavits offered by the executor, which reveal that during the time in question, Ms. Crawford was capable of attending to her own affairs and understood what she was doing when she executed her testament. On this record, we find that summary judgment was properly granted; Garrett failed to establish that he would be able to satisfy his burden of proof at trial by clear and convincing evidence that, because of her mental condition, Ms. Crawford was unable to comprehend generally the nature and consequences of the testament when she executed the testamentary documents.

Decree
For the foregoing reasons, the judgment granting the succession representative's motion for summary judgment and dismissing Garrett Crawford's rule to oppose or annul his mother's testament and codicil is affirmed. Costs of this appeal are assessed to Garrett Crawford.
AFFIRMED.
NOTES
[1] These comments refer to a 1974 hospitalization.
[2] Under the version of Article 1482 in effect at the time of the execution of the testament in Succession of Duboin, the opponent of the will had the burden to prove lack of testamentary capacity, irrespective of whether the testator was interdicted. Succession of Duboin, 649 So.2d at 619.
[3] Garrett was not a forced heir under the law because he was over the age of 23 and had no mental or physical infirmity. See In re Succession of Helms, 01-1357 (La.App. 3rd Cir.3/6/02), 810 So.2d 1265, 1268.