900 So.2d 137 (2005)
SUCCESSION OF Salvadore CULOTTA, Jr.
No. 04-CA-1298.
Court of Appeal of Louisiana, Fifth Circuit.
March 1, 2005.
*138 Adam S. Lambert, New Orleans, Louisiana, for Plaintiff/Appellant.
Martha J. Maher, Galloway, Johnson, Tompkins, Burr & Smith, New Orleans, Louisiana, for Defendant/Appellee.
Jose A. Costa-Blanco, Covington, Louisiana.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and CLARENCE E. McMANUS.
MARION F. EDWARDS, Judge.
Appellant Anthony Culotta ("Anthony") appeals a judgment of the district court granting a Rule to Annul Probate of Testament, Vacate Appointment of Executor and Probate Previous Will in favor of appellees Judy Culotta Sudo, Frances Culotta Blanchard, Michelle Sudo, Renee Sudo Galey, and Cherie Sudo Lara (hereinafter referred to in the singular as "Judy Sudo"). The judgment further appointed Judy Sudo administratrix of the Succession of Salvadore Culotta Jr.
In August, 2001, Anthony filed a Petition For Probate Of Notarial Testament And Appointment Of Executor. The petition alleged that Anthony's father, Salvadore, died on April 27, 2001, and left a will in notarial form, dated February 16, 2001, naming him (Anthony) testamentary executor, without the necessity of posting bond. Attached to the petition was a copy of the will and Oath of Office. In the will, Salvadore stated that he had a visual impairment which prevented him from reading the testament, which was executed under the provisions of Louisiana Civil Code Article 1579. Salvadore left all of his property to Anthony, making him the executor without bond. The will bore the signature of Salvadore and two witnesses, and was duly notarized. On August 6, 2001, the court signed the Order of Probate, permitting the appointment of Anthony as Executor.
On September 14, 2001, Judy Sudo filed a Petition To Annul Probate Of Testament. The group alleged that they are the children and grandchildren of Salvadore, and were the heirs to his estate under a will dated April 21, 1989. They further alleged that the earlier will itself had been improperly destroyed by Anthony, and that the court should accept a copy of that will that was attached to the petition. They urged that Anthony was not in control of his mental faculties in February 2001, and that Anthony had exercised undue influence such that he substituted his own volition for that of Salvadore, and therefore, the will should be declared null and void.
Trial was held on June 24, 2004. At trial, Anthony testified that his relationship with his sister is strained, and many times he was not allowed to see his father. A worker from Elderly Protective Services suggested he visit his father at Judy's home accompanied by a friend, Mr. Johnny Williams.
Anthony and his wife had come to live with Salvadore, at Salvadore's home, on February 4, 2001. Anthony commenced living with him after Salvadore insisted at dinner one evening that he would not go back to stay with his daughter, Judy, in *139 Slidell. To reassure Salvadore, Anthony took his father to the police, who told him he could live wherever he wanted to, and thereafter Anthony and his wife went to stay at Salvadore's home with him. Salvadore did suffer from dementia at times, when he became agitated. Anthony knew that Salvadore took a lot of medication, but could not remember the names or the conditions for which he was treated. Salvadore was also on oxygen most of the time.
Some time after Anthony and his father came to live together, Anthony had an attorney, Mr. James Maguire, draw up a power-of-attorney for his father. Later, at the request of his father, he brought Salvadore to see Mr. Maguire again, at which time Salvadore made a will. Anthony was not in the room when the terms of the will were discussed and signed, and had not talked with Mr. Maguire about the document.
Salvadore had been married twice, and had one child, Frances, from a previous marriage, with whom Salvadore was not close. Anthony did not know why the will in question stated that Salvadore had been married only once. Anthony never suggested his father write a new will, or suggest the terms, but he was certain that Salvadore was lucid at that time. Investigators from protective services sent by Judy had inspected the living situation and verified that Anthony was caring for Salvadore.
James Maguire testified that he had been practicing for over thirty years, and had executed many wills. Anthony brought Salvadore into his office, at which time Salvadore discussed the power-of-attorney with him; Anthony was not present when the power-of-attorney was executed. Approximately ten days later, Anthony brought his father back to execute the will. Anthony told Maguire that his father was not incompetent. Maguire was not aware that Salvadore had been married twice, and had not seen any previous will of Salvadore's until after his death. Maguire and Salvadore discussed the will privately, at which time the attorney ascertained that Salvadore wished to leave his entire estate to Anthony and make him executor. Maguire was aware that Salvadore could not read, but did not know the extent or type of any visual impairment. He did not know that Salvadore had a diagnosis of dementia, and was not aware of any other medical condition. Salvadore seemed a little confused and a little disoriented, but this is fairly common among older people. However, Maguire believed Salvadore knew why he was there and what he wanted to do, and there was no question but that Salvadore understood the nature of what he was doing. It was his impression that Salvadore believed the other children would inherit from their mother, and that he wished to leave his portion of the estate to Anthony. Maguire based his decision to make the will on his own evaluation of Salvadore's mental status and his ability to express his wishes.
There were disputes between Anthony and Judy over the care of their father, as well as over the management of his assets. Maguire had the impression that Judy had total control over Salvadore, and that Anthony was concerned about his medical treatment as well as his finances. Maguire knew there would be some controversy over this new will, but was convinced that Salvadore understood what he was doing with the property. Salvadore had some money, ten or fifteen thousand dollars, and a house on Thirba Street as well as some property in Plaquemines Parish that pays royalties.
Judy Sudo testified that Salvadore first came to live with her in September, 1999 while her mother was sick, then he went *140 home for a time until her mother died. He came back to stay with her in December, 1999. Salvadore could not be left alone and did not remember how to take care of himself. After his wife's death, Salvadore was devastated and got worse. He took medication for blood pressure and dementia, and had heart and lung problems for which he had to take oxygen. When not taking oxygen, Salvadore would become sluggish and sometimes not remember where he was or what he was doing. During the time that he lived with Judy, Salvadore was often confused and didn't know the time or date, and this confusion progressed. He sometimes called Judy by his wife's name and had other delusions. However, at other times he knew family members and knew what was going on, and there were days when he did not suffer delirium.
Salvadore never expressed unhappiness in her home, but did want to live in his own place. Judy could not move there with him, and Salvadore could not live alone. Anthony visited Salvadore every four to six weeks, but did not provide support or care for him. After he went to live with Anthony, it appeared his mental status got worse. When asked why she contested the will in question, Judy replied that she did not think Salvadore remembered what he was doing at the time, and that he always said he would take care of all the children.
Judy Sudo's daughter, Michelle, testified that she assisted her grandfather in taking his medications when he lived in Judy's home. Salvadore's mental status was bad, and got worse as time went on. On the day that Anthony went to live with Salvadore, a policeman came to the house to collect Salvadore's things and told her that her grandfather was going to live in his home with Anthony. She did not speak to Salvadore at that time. She saw him again some time later at a restaurant, where he looked deplorable and did not eat anything. Salvadore stated that he regretted going home, and that Anthony and his wife slept in his bedroom. On that day, Michelle tried to use the telephone at Salvadore's home, and Anthony tried to hit her with it because she did not ask his permission.
In her opinion, her grandfather died because Anthony did not take good care of him. On one occasion, she visited Salvadore at home and he was not wearing his oxygen. She had no evidence, other than what she believed, regarding Salvadore changing his will.
Johnnie Williams, a long time friend of Salvadore's, testified that he went to visit Salvadore after he moved in with Judy. At the suggestion of a worker from Elderly Protection, he accompanied Anthony and took notes on the visits. There was a lot of tension between Judy and Anthony, and they argued in front of Salvadore. This upset Salvadore very much. On February 4th, Mr. Williams was with Anthony when they picked him up from Judy's. Mr. Sam, as Williams called him, said: "Thank God you're here. I'm not coming back. There's no way I will come back to this home. Things have just become too bad. I can't take it anymore ... I'd rather be in the penitentiary then come back to this house." Salvadore was upset because he was questioned after Anthony would take him out, and called Michelle a "bitch" and said the family was evil. Salvadore said he was afraid of Judy's husband Michael, because Michael would go through his things. When Williams tried to reassure him, Salvadore said: "You don't know this family." When Salvadore said these things, Anthony did not egg him on.
"Mr. Sam" had dementia, and there were times when he was confused. On the date he said he wanted to leave, he was *141 not in a confused state. When he first moved back to his home, he was no longer terrified as he had been on the visits to Judy's, but he did continue to have episodes of dementia. Williams accompanied Salvadore on the day he signed the will. Salvadore asked for Williams' opinion on what he should do, but Williams refused to comment. Salvadore was still angry about Michael, and had told Williams more than once that he didn't want his daughters and granddaughters "to get a damn thing." On February 16, 2001, Salvadore was not in a demented state. Williams accompanied Anthony and Salvadore to the attorney's office, and sat in the waiting room. At that time, Salvadore had his oxygen. Williams did not see Salvadore discuss the will with his attorney or sign it.
Admitted into evidence was a letter from Dr. Said Ahmed, dated February 20, 2001, in which he stated that Salvadore had been his patient for over ten years, that he had examined Salvadore that day, and that Salvadore was totally coherent with no dementia. The doctor concluded that Salvadore was of sound mind and able to handle any and all of his own affairs.
Other medical records were introduced. Dr. Pedro Serrant, an internist who treated Salvadore, stated that Salvadore took numerous medications, among them Exelon for dementia, which helps maintain the current level of brain functioning. The physician testified that Salvadore needed oxygen for his lung problems, and it also helped his brain functioning. Salvadore could have improved at times, and regressed at others. Dr. Serrant last saw Salvadore in January 2001 after he had fallen, at which time he was also having a flare-up of this lung disease and suffered deteriorating general health. He was a little less coherent, according to the family, with periods of disorientation. The Exelon was increased to improve his mental status. Dr. Serrant testified that in his best state, Salvadore was cooperative and able to communicate, but his mental status changed frequently.
Dr. Ratnakar Pernenkil, a cardiologist, testified that in addition to Exelon, Salvadore took numerous medications, including Haldol, which is also prescribed for agitation, Ambien, a sleeping aid, Valium, and Celexa, which is given for depression. Dr. Pernenkil was aware that Salvadore had progressive dementia, and at times he was very lucid while at other times he was totally confused.
Following presentation of the evidence, the case was taken under advisement, and subsequently, the trial court granted judgment in favor of Judy Culotta Sudo and the other appellees, granting the Rule to Annul Probate of Testament, Vacate Appointment of Executor and Probate Previous Will. The court also appointed Judy Sudo as executrix of Salvadore's succession. No reasons for judgment were given.
On appeal, Anthony urges that the court failed to apply the proper legal presumption in favor of capacity, and failed to apply the correct standard of proof to the claims of lack of capacity and undue influence.
The following Civil Code articles control our disposition in this case. Capacity to donate mortis causa must exist at the time the testator executes the testament. La. C.C. art. 1471. To have capacity to make a donation inter vivos or mortis causa, a person must also be able to comprehend generally the nature and consequences of the disposition that he is making. C.C. art. 1477. A donation inter vivos or mortis causa shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person *142 for the volition of the donor. C.C. art. 1479. A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation inter vivos or executed the testament. C.C. art. 1482. A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. However, if, at the time the donation was made or the testament executed, a relationship of confidence existed between the donor and the wrongdoer and the wrongdoer was not then related to the donor by affinity, consanguinity or adoption, the person who challenges the donation need only prove the fraud, duress, or undue influence by a preponderance of the evidence. C.C. art. 1483.
The intent of the testator controls the interpretation of his testament. If the language of the testament is clear, its letter is not to be disregarded under the pretext of pursuing its spirit. C.C. art. 1611. Revocation of a legacy or other testamentary provision occurs when the testator makes a subsequent incompatible testamentary disposition or provision. C.C. art. 1608.
Because the trial court did not give reasons for judgment, we do not know the basis of its apparent determination that the 2001 will was invalid. Here, the testament executed by Salvadore on February 16, 2001, is proper in form under La. C.C. art. 1579. Although Salvadore's declaration that he had been married only once and had only two children of that marriage is incorrect, we do not find that clause invalidates the will. The applicable codal articles require the courts to ascertain the intent of the testator and give it effect.
The ... code articles direct us to interpret a testament in a way that furthers, rather than frustrates, the testator's lawful intent.... The cardinal principle of the interpretation of acts of last will is to ascertain and honor the intent of the testator ascribing meaning to a disposition so that it can have effect ...
... In interpreting these articles, the courts endeavor to ascertain the testator's intention, and all other rules of construction are only means to that end. The Supreme Court has indicated that the function of the courts is to carry out the intention of the testator and effect should be given to all language contained in the will if possible.[1]
By the time the will was written in 2001, forced heirship had been abolished for some years, and thus Salvadore could lawfully leave his entire estate to Anthony if he chose to do so. The language in Salvadore's will leaves no doubt that such was his intention. Therefore, we find that his failure to include Frances' name in the will as his legal child is of no effect in these circumstances and does not operate to invalidate this testament.
Regarding the issue of Salvadore's capacity, there is a presumption in favor of testamentary capacity.[2] This presumption can only be overcome by clear and convincing evidence.[3] The clear and convincing standard requires a party to prove the existence of a contested fact is *143 highly probable, or much more probable than its non-existence.[4]
In the present case, the experienced attorney who prepared the will testified that although Salvadore seemed a little confused and a little disoriented as older people often are, Maguire believed Salvadore knew why he was there and what he wanted to do, and there was no question but that Salvadore understood the nature of what he was doing. Johnnie Williams, who frequently saw Salvadore both when he was confused and when he was not, testified that on February 16, Salvadore was not in a confused state and specifically told him what he was going to do.
As far as the medical evidence is concerned, Dr. Pernenkil agreed that although Salvadore had dementia and took numerous medications, at times, he was very lucid. Dr. Serrant testified that Salvadore's mental status changed frequently, but that in his best state, he was cooperative and able to communicate, and there were times when he was a lot more aware then others. Dr. Ahmed opined that Salvadore was of sound mind; however, this report was not obtained on the date in question, and under C.C. Art. 1482, the essential question before this court is Salvadore's state of mind at the time the will was confected. The appellees failed to introduce any evidence that Salvadore was incapable of understanding the nature and consequences of his actions on the day he made the will.
The case law is clear that proof, by clear and convincing evidence, of the presence of a mentally-debilitating condition at the approximate time that the will was executed is insufficient to prove lack of testamentary capacity at the time the will was executed, especially in light of conflicting evidence of the decedent's capacity at the actual time the will was executed.[5]
Our courts have determined that given the presumption in favor of capacity, opponents to a will failed to meet the clear and convincing standard, where a testator suffered from moderate Alzheimer's disease and there was conflicting testimony about her capacity. In that case, the witnesses who had contact with the testator on the day she wrote her will indicated that she understood and appreciated the consequences of what she was doing.[6] Similarly, testimony that a testator had been released from a geriatric psychiatric ward just days before she revoked her will was insufficient to establish incapacity where numerous witnesses testified that the testator understood the nature and consequences of her actions upon her release from the hospital and particularly on the day she executed the revocation.[7]
In another instance, hospital records showing that a testator had been diagnosed as suffering from anxiety, depression, dementia, organic brain involvement, brain atrophy, and metastatic brain disease, and was taking antidepressants, anti-anxiety drugs, tranquilizers, hypnotic drugs, and pain medication did not overcome the presumption of testamentary capacity.[8]

*144 In order to overcome this evidence of testamentary capacity, coupled with the legal presumption in favor of testamentary capacity, Ms. Vavrick was required to present clear and convincing proof that Ms. Braud did not have testamentary capacity at the time she executed the will.
... under the applicable legal principles, Ms. Vavrick's evidence is insufficient to meet her burden of proving lack of testamentary capacity with clear and convincing evidence, principally because it "does not contain anything to establish mental incompetency when the decedent executed her will." [Succession of] Mack, [88-0561 (La.App.4 Cir. 11/10/88)] 535 So.2d [461] at 463. The only witnesses present when the will was actually executed all testified unequivocally that Ms. Braud did have the necessary mental capacity to execute the will on the day the will was actually prepared. None of Ms. Vavrick's evidence rebuts this testimony.[9]
As in the above cases, appellees' evidence is insufficient to meet their burden of proving lack of testamentary capacity at the time the will was created. The fact that Salvadore suffered from dementia does not prove that he lacked the mental capacity to understand his actions, especially in light of the testimony of the only witnesses present with Salvadore on February 16th.
The issue of undue influence presents a more complicated question, one that often involves nuances that are difficult for the courts to interpret.
The concept of undue influence in our case law has been inexact. As a subjective standard, it is difficult to define, and thus prove. Article 1479 states that undue influence requires a showing that the "volition" or free will of the donor was replaced by the will of someone else.[10]
The Official Comments to C.C. art. 1479 read in part as follows:
Physical coercion and duress clearly fall within the proscription of the previous Article. The more subtle influences, such as creating resentment toward a natural object of a testator's bounty by false statements, may constitute the kind of influence that is reprobated by this Article, but will still call for evaluation by the trier of fact. Since the ways of influencing another person are infinite, the definition given in this Article is used in an attempt to place a limit on the kind of influence that is deemed offensive. Mere advice, or persuasion, or kindness and assistance, should not constitute influence that would destroy the free agency of a donor and substitute someone else's volition for his own.
In attempting to interpret the term, the courts have noted that aside from the statutory definition, undue influence is generally understood to mean "the exercise of psychological domination over a person to the extent that the person cannot help but do what the dominating party wishes."[11]
In a case arising out of the Third Circuit, two sons filed suit to invalidate their father's will, alleging undue influence by the third son, Michael, who became sole *145 beneficiary.[12] In finding that undue influence existed, the trial court had given extensive oral reasons, citing certain incidents which it found to have "served no useful purpose, other than exacerbating and creating resentment in that regard." The court could not accept these actions as in any way facilitating an improvement in the father's emotional condition. There was medical testimony that Michael reinforced his father's delusions about his brothers:
Although the trial court's reasons do not specifically refer to Dr. Ware or his testimony, the reasons for ruling reflect acceptance of the evidence presented by the plaintiffs insofar as they describe Sidney's "delicate emotional state" and facilitation of resentment existing toward Ronald and Errol. Only in the context of this background, can the actions at issue then be considered.
Here, although Anthony did take his father to the Police Department on February 4th and alleged abuse, Salvadore's comments quoted by Mr. Williams indicate that Salvadore had already determined to leave Judy's home. Further, when Salvadore would complain about Judy, Anthony would not encourage him. Salvadore told Williams more than once that he did not want his daughters and granddaughters to get anything. The only rebuttal offered by Judy was what she and Michelle believed to be Salvadore's desires. When the evidence shows that the execution of a testament was well within the discretion of the testator, the court should find that the testator's volition has not been substituted by the volition of any donee.[13] The evidence here falls far short of the necessary proof that Salvadore did not act of his own volition.
The trial court's finding of, or failure to find, undue influence is fact intensive, and such a finding cannot be disturbed on appeal in the absence of manifest error.[14] Reversal is warranted only if the appellate court finds that no reasonable factual basis for the trial court's finding exists in the record, and that the finding is clearly wrong.[15]
Without the benefit of reasons for judgment in the present matter, we cannot determine the evidence upon which the trial court relied. Nevertheless, our review of the record compels us to conclude that the trial court was manifestly erroneous, as there are no facts evidencing physical or emotional coercion on the part of Anthony within the meaning of C.C. art. 1479. Judy Sudo failed to carry her burden of proving, by clear and convincing evidence, that Salvadore lacked the necessary testamentary capacity or that the will was null because of undue influence.
For the foregoing reasons, the judgment of the trial court is reversed. The Order of Probate dated August 6, 2001 is reinstated. Appellees are taxed with all costs of this appeal.
REVERSED AND RENDERED
NOTES
[1] Derouen v. Derouen, 2003-623 (La.App. 3 Cir. 1/28/04), 865 So.2d 940, writ denied XXXX-XXXX (La.4/8/04) 870 So.2d 276, citations omitted.
[2] In re Succession of Linder 02-106 (La.App. 5 Cir. 7/30/02), 824 So.2d 523; Succession of Young, 96-1206 (La.App. 3 Cir. 3/5/97), 692 So.2d 1149; In re Succession of Chauffepied, XXXX-XXXXX (La.App. 3 Cir. 11/8/00), 775 So.2d 555.
[3] In re Succession of Linder, supra.
[4] Talbot v. Talbot XXXX-XXXX (La.12/12/03), 864 So.2d 590.
[5] In Re Succession of Linder, supra.
[6] See Succession of Christensen, 94-263 (La.App. 1 Cir. 12/22/94), 649 So.2d 23, writ denied sub nom. Succession of McGhee, 95-234 (La.4/7/95), 652 So.2d 1346
[7] See In re Succession of Chauffepied, supra. See also Succession of Deshotels, 98-1467, (La.App. 3 Cir. 5/12/99), 735 So.2d 826, 831.
[8] Succession of Braud 94-0668 La.App. 4 Cir. 11/17/94, 646 So.2d 1168, writ denied 95-0383 (La.3/30/95) 651 So.2d 841.
[9] Id. at 1171.
[10] In re: Succession of Cooper, 36,490 La.App. 2 Cir. 10/23/02, 830 So.2d 1087.
[11] Cupples v. Pruitt, 32,786 (La.App. 2 Cir. 3/1/00), (754 So.2d 328), writ denied, XXXX-XXXX (La.5/26/00), 762 So.2d 1108, quoting Laurie D. Clark, Comment, Louisiana's New Law on Capacity to Make and Receive Donations: "Unduly Influenced" by the Common Law?, 67 TUL. L.REV. 183, 221 (1992), and authorities therein.
[12] In re: Succession of Lounsberry, XXXX-XXXX (La.App. 3 Cir. 5/8/02), 824 So.2d 409, writ denied XXXX-XXXX (La.10/25/02), 827 So.2d 1163.
[13] In re: Succession of Gilbert 37,047 (La.App. 2 Cir. 6/5/03), 850 So.2d 733, writ denied XXXX-XXXX (La. 11/7/03) 857 So.2d 493.
[14] In Re: Succession of Gilbert, supra.
[15] Id.