SUCCESSION OF
JOSEPHINE CATALANO GENDRON

NO. 19-CA-206  C/W
20-CA-269 & 20-CA-272

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE FORTIETH JUDICIAL DISTRICT COURT
PARISH OF ST. JOHN THE BAPTIST, STATE OF LOUISIANA
NO. 71,86, DIVISION "B"
HONORABLE ROBERT J. KLEES, JUDGE PRO-TEMPORE

April 28, 2021

**STEPHEN J. WINDHORST**
**JUDGE**

Panel composed of Judges Jude G. Gravois,
Stephen J. Windhorst, and John J. Molaison, Jr.

**AFFIRMED**
    **SJW**
    **JGG**
    **JJM**

COUNSEL FOR INTERVENOR/APPELLANT,
KAREN GENDRON, MARIA GENDRON LAMBERT, TRACEY GENDRON
BOYLE, RAYE CLAIRE GENDRON, AND JUDY GENDRON KLINE
    Robert R. Faucheux, Jr.
    Christophe L. Faucheux
    Lindsay M. Faucheux

COUNSEL FOR DEFENDANT/APPELLEE,
RAYMOND GENDRON, JR., INDIVIDUALLY AND AS EXECUTOR OF THE
SUCCESSION OF JOSEPHINE CATALANO GENDRON
    Michael A. McNulty, Jr.
    Charles R. Jones

**WINDHORST, J.**

This consolidated appeal involves the Succession of Josephine Catalano Gendron (hereinafter "Ms. Gendron" or the "mother"), who was survived by six children and died testate. Appellants, Ms. Gendron's five daughters who intervened in the succession, appeal the trial court's August 27, 2018 and May 7, 2019 judgments regarding the validity of Ms. Gendron's last will and testament leaving almost the entirety of her estate to her only son, Raymond Gendron, Jr., appellee/independent executor. In the August 27, 2018 judgment, the trial court found that Ms. Gendron's last will and testament was valid in form under La. C.C. art. 1577. In the May 7, 2019 judgment, the trial court granted appellee's motion for involuntary dismissal on appellants' claims that Ms. Gendron lacked testamentary capacity and that her will was the product of undue influence, which resulted in the dismissal of their petition for intervention with prejudice. For the following reasons, we affirm the trial court's judgments.

**BACKGROUND**

Ms. Gendron was married to Raymond Roy Gendron, Sr. (hereinafter "Mr. Gendron"), who predeceased her and with whom she had six children, namely Karen Gendron, Maria G. Lambert, Tracey G. Boyle, Raye Claire Gendron, Judy G. Kline and Raymond Gendron, Jr. Mr. Gendron died on June 5, 2015. Ms. Gendron died on May 12, 2016 with a last will and testament (the "Will") executed on July 30, 2015 and signed by a notary and two witnesses. Mr. William O'Regan prepared the Will and acted as the notary. The Will names Ms. Gendron's son, Raymond Gendron, Jr., as the independent executor (hereinafter "Raymond" or the "Executor") of her succession and leaves the balance of her entire estate to him, except for a five percent (5%) commission to Jerry Bordelon on any rental houses sold. Mr. Bordelon was a long-time family employee who assisted Mr. and Ms. Gendron with their rental properties.

On June 17, 2016, the Executor filed a petition for probate of a notarial testament and a petition for confirmation of independent executor in St. John the Baptist Parish, the Fortieth Judicial District Court, seeking execution of the Will and his confirmation as independent executor. That same day, the trial court ordered the execution of Ms. Gendron's Will and confirmed Raymond as the independent executor of Ms. Gendron's succession. According to the sworn detailed descriptive list, Ms. Gendron's estate has a total gross value of $5,627,617.07.

On September 30, 2016, appellants filed a petition for intervention in Ms. Gendron's succession, contesting the validity of her Will. Appellants alleged that the Will was invalid because (1) Ms. Gendron did not have the capacity to comprehend the nature and consequences of the Will due to her declining mental and physical health, including memory lapses and behavioral changes; (2) the Will was a product of undue influence by the Executor in violation of La. C.C. art. 1479; and (3) Ms. Gendron did not declare the Will as hers or sign the Will in the presence of two competent witnesses in violation of La. C.C. art. 1577.

The trial in this case was bifurcated with the first trial addressing the validity of the will under La. C.C. art. 1577, and the second addressing whether Ms. Gendron had testamentary capacity to execute the Will and whether the Will was the product of undue influence. Both were bench trials.

**Trial on Validity of the Will**

The first trial took place on August 27, 2018 and the trial court heard testimony from the two witnesses to the Will, Mr. O'Regan (the attorney/notary), and two experts, who presented their opinions as to whether the Will complied with the requirements of La. C.C. art. 1577. Ms. Mary Lynn Champagne, a neighbor and friend of Ms. Gendron, signed the Will as a witness. Ms. Champagne testified that when she arrived at Mr. O'Regan's office on July 30, 2015, Ms. Gendron, the attorney and the other witness were already there, and that she signed the Will "pretty

soon after" she arrived there. She testified that no one read the Will out loud while she was there, and that Ms. Gendron did not state or signify that the document was her last will and testament in her presence. In fact, Ms. Champagne testified that she "had no idea it was her last will and testament." She just knew she was going to witness a document.

When asked whether she clearly remembered what happened at Mr. O'Regan's office that day, Ms. Champagne responded, "[n]ot too well. I remember facing Joe [Ms. Gendron], they were waiting for me to sign the document. I did not know who was in the room. I did not look around. It was very brief." At one point, Ms. Champagne testified that she did not observe Ms. Gendron's signature.

Ms. Pamela Cambre, a legal secretary for Mr. O'Regan for over thirty years, was the second witness to the signing of the Will. Ms. Cambre testified that she assisted with the preparation of the Will. She also testified that, on July 30, 2015, the day Ms. Gendron executed the Will, Mr. O'Regan brought Ms. Gendron to the library, had her read over her will, then brought the witnesses into the library, and asked her if she read the Will, whether she understood it, and whether it reflected her intentions.

Mr. O'Regan testified that Ms. Gendron contacted him in June 2015 after Mr. Gendron died about changing her Will to leave everything to Raymond. At this time, he warned her that leaving everything to Raymond would likely result in litigation, but she did not care. According to Mr. O'Regan's testimony, when he assists a testator with the execution of a will, he generally uses the following procedure: (1) he asks the testator to read the will; (2) he asks the testator if he or she understands the will and/or has any questions; (3) answers and discusses any questions; (4) announces to the witnesses that the testator has read his or her will; (5) asks the testator if the document is his or her will; and (6) after they say yes or signify that it is, the testator and the witnesses sign the will. He testified that he followed this

procedure on July 30, 2015 when Ms. Gendron executed her Will. He further stated that Ms. Champagne was present when he asked Ms. Gendron if the document was her Will, when Ms. Gendron said yes, and when she signed the Will.

Mr. O'Regan further testified that when the Will was executed, he had known Ms. Gendron for almost two years and that she was her usual self. He stated that she had a strong personality, knew what she wanted, and there was nothing incompetent about her at that time.

Monica Hof Wallace, a Loyola law professor who was accepted as a succession law expert, testified that the will was invalid under Louisiana law given Ms. Champagne's testimony that Ms. Gendron did not declare or signify that the instrument was her last will and testament in her presence. Elizabeth Carter, a Louisiana State University law professor who was also accepted as a succession law expert, testified that the will was valid because, based on the testimony of the Mr. O'Regan and Ms. Cambre, Ms. Gendron did declare or signify that the instrument was her last will and testament. Both Mr. O'Regan and Ms. Cambre testified that Mr. O'Regan has the testator sit and read the will and asks if this is the testator's will and then has the testator and witnesses sign the document. They both testified they followed standard procedure in executing Ms. Gendron's Will.

After hearing and considering the above testimony, on September 13, 2018, the trial court found that the testator had complied with the requirements of La. C.C. art. 1577 and that the Will was valid. In its reasons for judgment, the trial court stated that it found Mr. O'Regan and Ms. Cambre's testimony more compelling than Ms. Champagne's, and that appellants had failed to meet the high burden of proof required to show that the Will did not meet the requirements of La. C.C. art. 1577.

**Trial on Capacity and Undue Influence**

On April 22-24, 2019, the trial court heard testimony presented by appellants regarding whether Ms. Gendron had testamentary capacity to execute the Will, and whether the Will was the product of undue influence.

Appellants introduced Ms. Gendron's medical records into evidence to show that she had several health problems, including white matter disease[1], and that she lacked the mental capacity to execute the July 30, 2015 Will. Medical records reflect that Ms. Gendron had a history of heart disease, had a stent in her heart, had undergone bypass surgery, had extensive blockages, and suffered from white matter disease. The records do not indicate that Ms. Gendron suffered from any medical condition that would have substantially affected her mental capacity. Appellee introduced a July 6, 2015 letter from Dr. Andrew St. Martin stating that he examined Ms. Gendron and found that she had the mental capacity to make her own decisions. His conclusion was based on conversations with Ms. Gendron and a standard mini-mental status examination, a routine screening tool used for dementia.

Appellants presented two medical experts for their case. First, Dr. Dominic Arcuri, Ms. Gendron's primary care physician from October 1999 through August 2011, was accepted as an expert in primary care medicine. Dr. Arcuri testified that at Ms. Gendron's August 16, 2011 appointment, he diagnosed her with early onset Alzheimer's disease and prescribed two Alzheimer's medications to her. There, however, was no evidence indicating that Ms. Gendron ever took the Alzheimer's medications.

Second, Dr. Michael Chafetz, who performed a psychological autopsy[2] on Ms. Gendron, was accepted as an expert in neuropsychology and forensic psychology.

---

[1] White matter disease is a disease that affects the nerves that link various parts of the brain to each other and to the spinal cord. These nerves are also called white matter. White matter disease causes these areas to decline in their functionality.

[2] The term "psychological autopsy" is a psychological profile to determine the mental state of someone who is already deceased.

Dr. Chafetz found that Ms. Gendron was neurologically intact and met the requirements of testamentary capacity. However, he found it likely that the Will was the product of undue influence by Raymond. In making this conclusion, Dr. Chafetz relied on the facts that: (1) after her husband's death, she was in state of grief and changed her routine; (2) Raymond, who rarely visited before his father's death, began to visit daily so much that Mr. Bordelon warned Tracey Boyle (one of Ms. Gendron's daughters) not to trust him; (3) the daughters' assertion that Raymond intimidated and bullied them to the point that they avoided visiting their mother when he was at her house; and (4) it appeared Raymond fostered his mother's resentment against them. Dr. Chafetz also noted that given Ms. Gendron's interest in caring for all of her children, it was unlikely she would disinherit all of her daughters. According to Dr. Chafetz's testimony, while the daughters told him that Raymond Jr. bullied them, they did not tell him that Raymond bullied their mother. Dr. Chafetz also testified that it was his understanding from the daughters that Ms. Gendron was verbally abusive to her children and was the disciplinarian.

The following witnesses also testified at the second trial: three of Ms. Gendron's daughters, Tracey, Raye Claire, and Maria; Congetta Wheeler, Ms. Gendron's niece who regularly spoke to Ms. Gendron on the phone; and Mr. Bordelon, a long-time family employee. Ms. Champagne and Mr. O'Regan, who testified at the first trial, also testified at the second trial.

The daughters' testimony revealed the following facts. Their mother was the disciplinarian and often yelled at them, but their father managed the family business. Before their father died, Raymond was rarely around but often relied on their father for money. After their father died, Raymond began to visit their mother regularly and made it difficult and hostile for the daughters to see their mother. At the time their mother executed the 2015 Will, their mother's health was declining, she was frail, susceptible to falls, and had short term memory problems.

Mr. and Mrs. Gendron gave Tracey their power of attorney on January 30, 2009. She maintained that power of attorney until June 17, 2015, when her mother gave Raymond her power of attorney, which was about twelve days after their father died. Before her father's death, Tracey visited her parents every Sunday, spent time with them regularly, and often talked to her mother on the phone. She testified that Raymond was confrontational and intimidated and bullied her and her sisters. On the day of her father's wake, Ms. Gendron had the locks changed on the house because she couldn't find the key to her house and their father's back office.

Raymond's behavior towards his mother started to change the week their father died when he started hanging around the house more often. Ms. Gendron acted differently with Raymond around, and the daughters felt isolated from their mother because of Raymond. Tracey was concerned about her mother after her father's death because she was forgetting things, losing her temper often, and fearful of all the changes. After her father died, on one occasion when Tracey and her husband visited her mother, her mother was very cold to them which was unusual. Soon thereafter, when Tracey asked her mother to go to lunch, her mother was at first resistant but eventually said it was fine but that they could not discuss the business.

According to Raye Claire, their mother did not drive the last several years of her life and was dependent on others to take her places. Her mother also apparently relied on others to fill her pill bottles and to handle household bills.

Maria, a registered nurse, helped care for her mother whenever she was sick, knew everything about her medical conditions, assisted with medications on a weekly basis, and communicated with her doctors. Marie testified that she always had a very close relationship with her mother.

At the second trial, Ms. Champagne testified that she drove Ms. Gendron around quite often during the last few years of her life and that she used a walker

occasionally. She recalled Ms. Gendron falling once at home and that she had some bruising as a result. At Ms. Gendron's request, Ms. Champagne went over to Ms. Gendron's house while she showered in case she fell. She testified that after Mr. Gendron died, Ms. Gendron was grieving and lonely, and went through a period of adjustment. According to Ms. Champagne, Raymond visited Ms. Gendron more after Mr. Gendron died.

At the second trial, Mr. O'Regan testified that Ms. Gendron changed her Will on July 30, 2015 to leave everything to Raymond because her daughters had been mean to her and she was mad at them. Because he believed that litigation would likely ensue from the Will, Mr. O'Regan testified that he told Ms. Gendron that he did not want Raymond anywhere around or at his office for the signing of the Will.

After appellants presented their case on undue influence and testamentary capacity, appellee moved for an involuntary dismissal. The trial court granted the motion for involuntary dismissal, finding that: (1) there was no evidence that Ms. Gendron lacked capacity; (2) the evidence that she was frail, did not drive, and needed someone to watch her bath does not destroy capacity; (3) the evidence of brain shrinkage and physical deterioration does not destroy capacity; and (4) there was no time for protracted alienation of affection or undue influence. The trial court specifically referred to Mr. O'Regan's testimony that Ms. Gendron called him twice about changing her will and that no one was going to influence Ms. Gendron to do something she did not want to do.

**ASSIGNMENTS OF ERROR and ANALYSIS**

Appellants assert that the trial court erred in: (1) finding Ms. Gendron's Will compliant with La. C.C. art. 1577 based on Mr. O'Regan and Ms. Cambre's testimony; (2) granting an involuntary dismissal on the undue influence issue; (3) granting an involuntary dismissal on testator's testamentary capacity; and (4)

denying appellants the opportunity to question Jerry Bordelon as a hostile witness under La. C.E. art. 611, but allowing appellee to ask Mr. Bordelon leading questions.

**Standard of Review**

A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Succession of Bradley, 20-168 (La. App. 5 Cir. 12/2/20), 309 So.3d 397, 403. The reviewing court must review the record in its entirety to determine whether the trial court's finding was clearly wrong or manifestly erroneous. Id. When fact findings are based on determinations regarding the credibility of witnesses, the manifest error/clearly wrong standard demands great deference to the trier of fact's findings. Korrapati v. Augustino Bros. Constr., LLC, 19-426 (La. App. 5 Cir. 7/31/20), 302 So.3d 147, 153. A trial court's determination as to the credibility of witnesses is entitled to great deference. Id.

**Validity of Ms. Gendron's Will**

Appellants assert that the trial court erred in finding Ms. Gendron's will valid under La. C.C. art. 1577 because Ms. Champagne testified that she did not observe Ms. Gendron's signature on the Will and that Ms. Gendron did not declare or signify that the Will was her last will and testament in her presence. For the following reasons, we find no error in the trial court's finding the Will valid.

La. C.C. art. 1577 requires that the notarial testament be prepared in writing and dated. If the testator knows how to sign his name, can read, and is physically able to do both, this Article requires that the testament be executed in the presence of a notary and two competent witnesses, that the testator declare or signify to the witnesses that the instrument is his testament, and that the testator sign his name at the end of the testament and on each other separate page. In addition, the witnesses, in the presence of the testator and each other, and the notary must sign a declaration, that the testator in their presence has declared or signified that the instrument is his

testament and has signed it at the end and on each other separate page. La. C.C. art. 1577.

The Louisiana Supreme Court has recognized that the Legislature adopted the statutory will to avoid the rigid formal requirements of the Louisiana Civil Code. Successions of Toney, 16-1534 (La. 5/3/17), 226 So.3d 397, 402. The statutory will's minimal formal requirements are designed to provide a simplified means for a testator to express his testamentary intent and to assure, through his signification and his signing in the presence of a notary and two witnesses, that the instrument was intended to be his last will. Id. Courts liberally construe and apply the statute, maintaining the validity of the will if at all possible, as long as it is in substantial compliance with the statute. Id. Louisiana courts have held statutory and notarial wills invalid when they contain material deviations from form requirements, even in the absence of any indication of fraud. Successions of Toney, 16-1534 (La. 5/3/17), 226 So.3d 397, 407.

According to Ms. Champagne's testimony, Ms. Gendron did not declare or signify that the Will was her last will in Ms. Champagne's presence, and Mr. O'Regan did not ask Ms. Gendron if the document was her last will. In addition, Ms. Champagne did not recall observing Ms. Gendron sign the Will. On the other hand, Mr. O'Regan and Ms. Cambre testified that Ms. Gendron did declare that the Will was her last will and testament.

Mr. O'Regan testified that when he oversees the execution of a will, he generally uses the following procedure: (1) he asks the testator to read the will; (2) he asks the testator if he or she understands the will and/or has any questions; (3) he answers and discusses any questions; (4) he announces to the witnesses that the testator has read his or her will; (5) he asks the testator if the document is his or her will; and (6) after the testator says yes or signifies that it is, the testator and the

witnesses sign the will. He testified that he followed this procedure when Ms. Gendron executed her Will, and that Ms. Champagne was present when he asked Ms. Gendron if the document was her Will, she said yes, and she signed the Will. Ms. Cambre also testified that Mr. O'Regan followed standard protocol when Ms. Gendron executed the Will, by which Mr. O'Regan always ensures that the witnesses know the document the testator is signing is her last will and testament.

Considering the deference to which trial court's reasonable evaluations of credibility are entitled and the record before us, we cannot say the trial court erred in finding Mr. O'Regan and Ms. Cambre's testimony more credible. The trial transcript indicates that Ms. Champagne had trouble recalling certain details about the execution of the Will, while Mr. O'Regan and Ms. Cambre appeared to have a better recollection of the execution of the Will and testified that they paid particular attention to this Will signing because they believed it was likely to result in litigation. Because Mr. O'Regan and Ms. Cambre handled the preparation and the execution of the Will, it seems more plausible that they would have a clearer recollection of the signing of the Will as opposed to a witness who was only present for a brief period to witness and sign the document.

We recognize that both appellants and appellee presented expert testimony from law professors regarding the validity of the Will under La. C.C. art. 1577. It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Phillips v. Doucette & Associated Contractors, Inc., 17-93 (La. App. 5 Cir. 10/25/17), 229 So.3d 667, 672. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. Id. While

the testimony from these legal professors was informative, it is the province of the judge to determine legal issues presented to the court. In addition, it appears from the record that appellants' expert did not review, hear, or consider Mr. O'Regan and Ms. Cambre's testimony, but only heard Ms. Champagne's testimony. Accordingly, we find no error in the trial court's finding the Will valid.

**Undue Influence**

Appellants also challenge the trial court's finding that they failed to present clear and convincing evidence that the Will was the product of undue influence.

A donation *inter vivos* or *mortis causa* shall be declared null upon proof that it is the product of influence by the donee or another person that so impaired the volition of the donor as to substitute the volition of the donee or other person for the volition of the donor. La. C.C. art. 1479. A person who challenges a donation because of fraud, duress, or undue influence, must prove it by clear and convincing evidence. La. C.C. art. 1483; Succession of Bradley, 20-168 (La. App. 5 Cir. 12/2/20), 309 So.3d 397, 406. Undue influence has a subjective standard, which is difficult to define, and thus prove. In re Succession of Culotta, 04-1298 (La. App. 5 Cir. 3/1/05), 900 So.2d 137, 144, writ denied, 05-817 (La. 5/13/05), 902 So.2d 1024. Courts have interpreted undue influence to mean the exercise of psychological domination over a person to the extent that the person cannot help but do what the dominating party wishes. Id. When seeking to annul a donation on the basis of undue influence, it is not sufficient to merely show that the donee exercised some degree of influence over the donor; instead, the challenger must show that the donee's influence was so substantial that the donee substituted his or her volition for that of the donor. Succession of Bradley, 309 So.3d at 406.

Our thorough review of the record shows that appellants could not satisfy this burden of proof. First, the medical evidence did not show Ms. Gendron suffered from a mental illness that would make her more susceptible to influence. In

accordance with her attorney's advice, she underwent an exam by her primary care physician, Dr. St. Martin, before executing the Will, and he opined that she had the mental capacity to make her own decisions. The medical evidence showed that Ms. Gendron was suffering from medical issues typical of her age, but none so serious as to inhibit her ability to make her own decisions when executing her Will.

Second, the testimony at trial indicated that Ms. Gendron was a strong-willed woman who made her own decisions. Mr. O'Regan testified that Ms. Gendron had a strong personality and that she called him and requested his assistance in preparing a new will. Mr. Bordelon, who worked for the Gendrons for years, testified that Ms. Gendron was independent and strong-minded, that she was the boss, and that she ran the household. In fact, Ms. Gendron had Mr. Bordelon change the locks on the house after Mr. Gendron died because she was uncertain who had keys to her house and wanted to control everything that was going on in the house. The daughters' testimony indicated that Ms. Gendron was single-minded and stubborn, often yelled at them, was very vocal, and at times emotionally abusive to them as children. Although they testified that Ms. Gendron was frail after their father died, their testimony is insufficient to support a finding that she allowed Raymond to influence her to substitute his volition for hers.

Third, we recognize that there was testimony Raymond was a bully and intimidated his sisters; however, there's very little, if any, evidence that he intimidated Ms. Gendron. Ms. Wheeler, Ms. Gendron's niece who spoke to her aunt three times per week, testified that Ms. Gendron was hesitant to talk to her when Raymond was around, and that she would often end their phone calls when Raymond came into the room or house. This, however, does not establish that he influenced her or made her substitute his will for hers. The daughters could not identify instances where Raymond intimated or bullied Ms. Gendron. The testimony actually

indicated that Ms. Gendron was more dominant as she had a temper and often chastised all her children.

Fourth, there was such a short time frame between when Ms. Gendron actually changed her Will and when Raymond started spending more time with his mother, which was around the time Mr. Gendron died. Mr. Gendron died on June 5, 2015; Ms. Gendron contacted Mr. O'Regan about changing her Will in mid-June 2015, and executed the new Will on July 30, 2015. This fifty-five day period seems a very short period to unduly influence an apparently strong-minded individual like Ms. Gendron.

Finally, although appellants presented expert testimony from Dr. Chafetz that, based on his psychological autopsy, Ms. Gendron was unduly influenced by Raymond, he never met or interviewed Ms. Gendron or Raymond. When findings are based on determinations regarding the credibility of witnesses, including expert witnesses, the manifest error/clearly wrong standard demands great deference to the findings of the trier of fact. Phillips, 229 So.3d at 672. Because he never had an opportunity to meet or interview the two primary individuals at issue here, we cannot say the trial court was manifestly erroneous in not relying on Dr. Chafetz's testimony.

In light of the foregoing, we cannot say the trial court was manifestly erroneous or clearly wrong in finding that the Will was not the product of undue influence.

**Testamentary Capacity**

Appellants next challenge the trial court's finding that Ms. Gendron had testamentary capacity. La. C.C. art. 1477 provides that, "To have capacity to make a donation *inter vivos* or *mortis causa*, a person must also be able to comprehend generally the nature and consequences of the disposition that he is making." La. C.C. art. 1482 states:

A person who challenges the capacity of a donor must prove by clear and convincing evidence that the donor lacked capacity at the time the donor made the donation *inter vivos* or executed the testament. However, if the donor made the donation or executed the testament at a time when he was judicially declared to be mentally infirm, then the proponent of the challenged donation or testament must prove the capacity of the donor by clear and convincing evidence.

There is a presumption in favor of testamentary capacity. In re Succession of Culotta, 04-1298 (La. App. 5 Cir. 3/1/05), 900 So.2d 137, 142-43, writ denied, 05-0817 (La. 5/13/05), 902 So.2d 1024. This presumption can only be overcome by clear and convincing evidence, which requires a proof that the contested fact is highly probable, or much more probable than its non-existence. Id.

The medical evidence supported a finding that Ms. Gendron had testamentary capacity to execute the Will on July 30, 2015. Ms. Gendron underwent an examination specifically to obtain an opinion that she had mental capacity to execute a will. Dr. St. Martin conducted the examination, and sent Mr. O'Regan a letter stating that Ms. Gendron had the mental capacity to make her own decisions. Dr. Chafetz, appellants' expert, also determined and testified that Ms. Gendron had testamentary capacity to execute the Will.

In addition, based upon our review of the trial testimony in its entirety, the record does not support a finding of clear and convincing evidence that Ms. Gendron lacked capacity to execute the Will on July 30, 2015. As noted by the trial court, frailty, declining health, and a changed demeanor are not enough to render her incapable. Accordingly, we cannot say the trial court was manifestly erroneous in finding Ms. Gendron had capacity to execute the July 30, 2015 Will.

**Leading Questions**

Appellants assert that the trial court erred in denying appellants the opportunity to question Mr. Bordelon as a hostile witness under La. C.E. art. 611 but allowing appellee to ask Mr. Bordelon leading questions. We find no abuse of

discretion in the trial court's refusal to allow appellants to ask Mr. Bordelon leading questions.

The trial court maintains the discretion to permit the use of leading questions. La. C.E. art. 611(A) and (C). Only a clear abuse of that discretion which prejudices the party's rights will justify reversal. State In Interest of J.S., 17-908 (La. App. 4 Cir. 2/7/18), 238 So.3d 600, 604, writ denied sub nom., State in Interest of J.S., 18-375 (La. 4/16/18), 240 So.3d 923.

The transcript of Mr. Bordelon's testimony shows that he responded to appellants' questioning clearly and without an issue. In addition, the record reflects that appellants cannot show any prejudice resulting from the trial court's refusal to allow them to treat Mr. Bordelon as a hostile witness. Thus, this assignment of error has no merit.

**Involuntary Dismissal**

As part of appellants' assignments of error challenging the findings of testamentary capacity and the lack of undue influence, appellants assert the trial court erred in granting appellee's motion for involuntary dismissal. In a nonjury case, La. C.C.P. art. 1672(B) authorizes the trial court to grant an involuntary dismissal of the action at the close of the plaintiff's case. "The trial court has much discretion in determining whether to grant a motion for involuntary dismissal." Trosclair v. Becnel, 14-676 (La. App. 5 Cir. 9/9/14), 150 So.3d 324, 327. An appellate court may not reverse a ruling on a motion for involuntary dismissal unless it is manifestly erroneous or clearly wrong. Dileo v. Harry, 17-240 (La. App. 5 Cir. 12/13/17), 238 So.3d 549, 556-57. In determining whether an involuntary dismissal should be granted after the plaintiff has completed the presentation of his evidence during a bench trial, the appropriate standard is whether the plaintiff has presented sufficient evidence in his case-in-chief to establish his claim by a preponderance of

the evidence. <u>Id.</u> The trial court is not required to review the evidence presented in the light most favorable to the plaintiff." <u>Id.</u>

Considering the record before us and the reasons stated herein, we cannot say the trial court was manifestly erroneous in granting the motion for an involuntary dismissal in this matter relative to the issues of undue influence and testamentary capacity.

**DECREE**

For the foregoing reasons, we affirm the trial court's August 27, 2018 and May 7, 2019 judgments in this consolidated appeal.

**<u>AFFIRMED</u>**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

CURTIS B. PURSELL
CLERK OF COURT

NANCY F. VEGA
CHIEF DEPUTY CLERK

SUSAN BUCHHOLZ
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **APRIL 28, 2021** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

_Curtis B. Pursell_
**CURTIS B. PURSELL**
CLERK OF COURT

# 19-CA-206
### C/W 20-CA-269 & 20-CA-272

**E-NOTIFIED**
40TH DISTRICT COURT (CLERK)
HONORABLE ROBERT J. KLEES (DISTRICT JUDGE)
HONORABLE NGHANA LEWIS (DISTRICT JUDGE)
CHRISTOPHE L. FAUCHEUX (APPELLANT)     LINDSAY M. FAUCHEUX (APPELLANT)     ROBERT R. FAUCHEUX, JR. (APPELLANT)
CHARLES R. JONES (APPELLEE)

**MAILED**
MICHAEL A. MCNULTY, JR. (APPELLEE)
ATTORNEY AT LAW
4608 RYE STREET
METAIRIE, LA 70006